IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN W. COSTELLO, not individually, but as Litigation Trustee under the Comdisco Litigation Trust, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No.   05 C 0726 |
| JULIUS G. HALLER | ) ) | Judge Robert W. Gettleman |
| Defendant, | ) ) | |
| ——————————————————— | ) | |
| | ) | Reassigned for preliminary proceedings: |
| JOHN A. BLAIR, | ) | 05 C 0732 |
| ROMAN BRUNNER | ) | 05 C 0740 |
| BRYANT COLLINS, | ) | 05 C 0728 |
| DAVID S. COONS, | ) | 05 C 0739 |
| CHARLES A. DALE, | ) | 05 C 0766 |
| ORRY D. DUBOIS, | ) | 05 C 0780 |
| CLAUS DUERR, | ) | 05 C 0737 |
| JAMES D. DUNCAN, | ) | 05 C 0789 |
| HAROLD L. FINKEL, | ) | 05 C 0771 |
| ALLEN J. GRAHAM, | ) | 05 C 0735 |
| STEVEN R. GRUNDON, | ) | 05 C 0763 |
| MICHAEL F. HERMAN, | ) | 05 C 0731 |
| JOSEPH D. HOLD, | ) | 05 C 0782 |
| JAMES D. JENKS, | ) | 05 C 0770 |
| JEFFREY D. KNAUS, | ) | 05 C 0772 |
| MICHAEL G. MCFARLAND, | ) | 05 C 0733 |
| STEPHEN J. MCFARLAND, | ) | 05 C 0769 |
| KEITH M. OLENEK, | ) | 05 C 0761 |
| LYSSA K. PAUL, | ) | 05 C 0776 |
| MIKE J. POISELLA, | ) | 05 C 0736 |
| THOMAS J. PRENDERGAST, | ) | 05 C 0727 |
| DEAN J. PROKOS, | ) | 05 C 0767 |
| PAUL SANFILLIPPO, | ) | 05 C 0729 |
| JEFFREY R. SCHWIERING, | ) | 05 C 0781 |
| JOSEPH J. SCOZZAFAVA, | ) | 05 C 0746 |
| KEITH TILLEY, | ) | 05 C 0745 |
| GREGORY A. WEISS, | ) | 05 C 0764 |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In these related cases, plaintiff John W. Costello, Litigation Trustee of the Comdisco Litigation Trust, has sued defendants seeking to enforce defaulted promissory notes. The court has already issued a number of opinions in these cases, including denying a motion to dismiss by all defendants based on lack of standing. Costello v. Haller, 05 C 726 (N.D. Ill. September 23, 2005) ("Costello I"). After all attacks on the pleadings were resolved, all defendants answered the complaint raising a number of affirmative defenses and filed a two count counterclaim. The court then granted in part and denied in part plaintiff's motion to dismiss the counterclaim and to strike the affirmative defenses, and granted plaintiff's motion to strike defendants' jury demand. Costello v. Haller, 05 C 726 (N.D. Ill. September 19, 2006) ("Costello II"). Plaintiff then moved for summary judgment against defendants Duncan and Paul on the complaint and counterclaim. Those defendants filed a cross motion for summary judgment, arguing that the notes were unenforceable because they were part of an illegal program. On December 21, 2007, the court granted plaintiff's motion for summary judgment and denied defendants' motion for summary judgment. Costello v. Haller, 2007 WL 4591381 (N.D. Ill. 2007) ("Costello III").

The parties then attempted to work out a procedure by which the remaining cases would either: 1) be settled; or 2) defendants would agree to judgment against them based on the Duncan and Paul ruling, and proceed to an immediate appeal; or 3) would proceed on new motions for summary judgment. When those efforts proved futile, plaintiff moved for summary judgment on the remaining 25 cases. Defendants then hired new attorneys who sought leave to amend their fifth affirmative defense to argue that the Comdisco Shared Investment Plan ("SIP") violated § 17(a) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5, and their sixth affirmative defense to argue that those violations constitute a breach of contract which

2

excuses defendants' nonperformance. Rather than oppose that motion, plaintiff simply

supplemented his motion for summary judgment to address those issues. The matter is now fully

briefed[1] and, for the reasons discussed below, the court grants plaintiff's motion for summary

judgment.[2]

## FACTS

Defendants are all former employees of Comdisco Inc. In early 1998 Comdisco

sponsored and implemented the SIP for certain senior management level employees. The SIP

gave participating employees the opportunity to invest in the company by purchasing stock ("SIP

shares") with personal loans guaranteed by Comdisco. One hundred percent of the purchase

price of the stock was financed by loans from lender banks ("lenders" or "banks") represented by

First National Bank of Chicago (now Bank One) as their agent. Comdisco received the loan

proceeds directly from the lenders and held the SIP shares. The guarantee was documented in a

Facility and Guaranty Agreement ("Facility Agreement") between Comdisco and the lenders.

The SIP notes had a fixed maturity and, at maturity, a final balloon payment of principal and

interest was due.

---

[1]Defendants' brief in opposition to plaintiff's motion for summary judgment is an eye-popping 103 pages. The court allowed such an oversized brief with the understanding that such length was necessary to present at least some individual arguments for the 25 defendants remaining in the case. To the contrary, however, defendants' brief presents a unified position for all defendants, and does so in a repetitive, undisciplined manner that has unnecessarily taxed the court's resources.

[2]Defendants Duncan and Paul have also sought to amend their affirmative defenses and counterclaim. Plaintiff has objected to this motion because it comes after the court has already granted summary judgment against those defendants. The court denies Duncan and Paul's motion (Docket No. 187) as untimely and, based on the instant opinion, futile.

The details of the SIP and the circumstances surrounding its presentation to potential participants has been described in detail in the court's previous opinions and will not be repeated here. For purposes of the instant motion it is sufficient to note that each participant received a binder fully explaining those details. As stated in those materials, the SIP shares were subject to a variety of restrictions on resale. Although neither the Facility Agreement nor the SIP notes contained any restrictions on the stock, they both reference the SIP shares as "restricted stock." It is uncontested that the SIP materials fully disclosed and explained to potential participants all such restrictions. In particular, each participant, including each defendant in the instant cases, was told that: (1) Comdisco retained the right of first refusal on the sale of the purchased shares; (2) if the shares were sold within three years of the purchase date, Comdisco was entitled to 50% of any gain from the sale of the stock; (3) if the participant voluntarily left Comdisco within three years of the purchase date (other than for death, disability or change in control of the company), Comdisco was entitled to 50% of any gain from the sale of the stock at any time in the future; (4) Comdisco's compensation committee had the right to impose restrictions on the timing, amount and form of the sale of the SIP shares with respect to any participant if it determined that the restrictions were in the best interest of Comdisco; (5) the shares could not be pledged as security for any other loan; and (6) the proceeds from any sale of the stock had to be applied first to the principal, interest and early payment fees outstanding on the loan.

Each of the defendants participated in the SIP, purchasing varying numbers of shares at the then market rate of $34.50 per share. Within six months of implementation of the SIP program, Comdisco's stock split, giving defendants double the number of shares they originally purchased. Just after the second anniversary of the SIP, Comdisco's stock was trading at $53 per

share (more than three times the purchase price). A number of participants elected to sell their SIP shares at that time, generating proceeds sufficient to retire their notes and return a profit, even after the 50% share of the gain to Comdisco required the restriction on sale prior to the third year anniversary.

In July 2001, however, Comdisco filed for bankruptcy protection, an event of default under the SIP notes causing Bank One to accelerate the full amounts due under those notes. Comdisco Holding Company, as successor to Comdisco, ultimately settled is guarantee obligation to the lenders for $126 million. As part of that settlement, the lenders assigned all rights associated with the SIP notes against the borrower to the Comdisco Litigation Trustee (plaintiff). In Costello I the court held that plaintiff was the holder of the defendants' notes with all rights of enforcement.

## DISCUSSION

Plaintiff has moved for summary judgment arguing that, as in Costello III, the undisputed facts demonstrate his right to enforce and collect the notes. Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, admissions and affidavits on file show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

As in Costello III, there is no dispute as to the facts supporting plaintiff's claim against the remaining defendants. Defendants admit: they executed their respective SIP notes; they directed that the proceeds of the loans be paid directly to Comdisco; Comdisco received those proceeds; the shares were issued to defendants but held by Comdisco's transfer agent on defendants' behalf; and the notes have not been paid. Therefore, all elements of plaintiff's claim

have been undeniably established and, absent a viable affirmative defense or counterclaim,

plaintiff is entitled to judgment.

In Costello III the court rejected defendants Duncan and Paul's counterclaim and all of

their affirmative defenses. The instant defendants raise the same counterclaims and defenses and

the court's ruling in Costello III will not be revisited. As noted, however, the instant defendants

were granted leave to amend two affirmative defenses to try to plead around the court's

conclusion in Costello III that defendants did not have standing to raise a violation of Federal

Reserve Board Regulations G or U as a defense. To avoid this conclusion, defendants have

amended their fifth affirmative defense to now allege that Comdisco committed securities fraud

by telling the SIP participants that the SIP program would not violate Regulations G or U.

Defendants have also added an affirmative defense alleging a breach of contract by Comdisco

based on the alleged violations of the Regulations that would excuse the defendants'

nonperformance. Although defendants have put a creative new gloss on their original argument,

the result is the same. To use a currently popular phrase "you can put lipstick on a pig, but it is

still a pig."

Both of defendants' new affirmative defenses rely entirely on their argument that the SIP

program violated Federal Reserve Board Regulations G (12 C.F.R. §207) and U (12 C.F.R. §

221). These regulations were promulgated pursuant to § 7 of the Exchange Act (15 U.S.C. §

78(g)(a)), which provides:

> For the purpose of preventing excessive use of credit for the purchaser carrying of
> securities, the Board of Governors of the Federal Reserve System shall . . .
> prescribe rules and regulations with respect to the amount of credit that may be
> initially extended and subsequently maintained on any security (other than an
> exempted security).

As the legislative history of the Act explains (H.R. Rep. No. 1383, 73rd Cong., 2d Sess. 709 (1934)), margin requirements are intended to maintain the integrity of the credit market:

> The main purpose of these margin provisions . . . is not to increase the safety of securities loans for lenders. Banks and brokers normally require sufficient collateral to make themselves safe without the help of law. Nor is the main purpose even protection of the small speculator by making it impossible for him to spread himself too thinly – though such a result would be achieved as a byproduct of the main purpose.
>
> The main purpose is to give a government credit agency an effective method of reducing the aggregate amount of the nation's credit resources which can be directed by speculation into the stock market and out of other more desirable uses of commerce and industry – to prevent a recurrence of the pre-cash situation where funds which would otherwise have been available at normal interest rates for uses of local commerce, industry, and agriculture, were drained by far higher interest rates into security loans and the New York call market.

Regulation G, which governs "Securities credit by persons other than banks, brokers, or dealers," generally prohibits a lender that is not a bank or a broker-dealer from extending credit for the purpose of purchasing or carrying margin stock ("purpose credit") that is secured directly or indirectly by margin stock, in an amount that exceeds the maximum loan value of the stock securing the loan. 12 C.F.R. § 207.3(b). The maximum loan value of margin stock is 50% of its current market value. 12 C.F.R. § 207.7(a). Margin stock includes any equity security traded on a national securities exchange. 12 C.F.R. § 207.2(i). Regulation U similarly limits the amount of credit that banks may extend for the purpose of purchasing or carrying margin stock to 50% of the current market value of that stock. 12 C.F.R. §§ 22.3(a) and 221.8(a).

In the instant case, defendants argue that Comdisco violated Regulation G and the banks violated Regulation U by extending "purpose credit" to defendants in amounts greater than the loan value of the SIP shares (50% of the then current market value), when the credit was secured by those shares.

In 1969 the Board issued an interpretive regulation, 12 C.F.R. 207.103, entitled

"Corporate guarantee of bank loan and extension of credit in the ordinary course of business," in

which the Board analyzed a corporate stock option plan similar the instant SIP.  The Board

determined that the guarantee by a corporation of an "unsecured" bank loan to exercise an option

to purchase stock of the corporation is an "extension of credit" for purposes of Regulation G, is

given "in the ordinary course of business" of the corporation, and that the bank involved took

part in arraigning for such credit on better terms than it could extend under Regulation U.

Therefore the Board concluded that both the company and the bank were required to register,

and the company could not give guarantees in excess of the maximum loan value of the

collateral pledged to secure the guarantee.  In the interpretive regulation, the corporation held the

purchase shares as collateral to secure it against loss on the guarantee.  12 C.F.R. § 207.103.

The Comdisco SIP appears to have been designed with an intent to avoid the implications

of § 207.103.  Toward that end, the SIP was designed so that neither the banks' nor Comdisco's

"extension of credit" was directly secured by the purchase shares.  Thus, the validity of

defendants' argument that the SIP violates the two regulations depends entirely on whether

either Comdisco or the banks' extension of credit was "indirectly secured" by the SIP shares.

The regulations define indirectly secured as (see 12 C.F.R. § 207.2(f)):

(1) includ[ing] any arrangement with the custodian under which

> (i) the customer's right or ability to sell, pledge, or otherwise
> dispose of margin stock owned by the customer is in anyway
> restricted while the credit remains outstanding, or

> (ii) the exercise of such right is or maybe cause for accelerating the
> maturity of the credit.

(2) does not include such arrangement if:

* * *

(iii) the lender holds the margin stock only in capacity of custodian, depository, or trustee, or under similar circumstances, adding good faith, has not relied upon the margin stock as collateral;

(iv) if the lender, in good faith, has not relied upon the margin stock as collateral in extending or maintaining credit.

As noted above, the SIP shares were subject to a number of restrictions including: (1) Comdisco's right of first refusal; (2) Comdisco's right to 50% of the profit from any sale within three years; (3) the shares could not be pledged as security for any other loan; and (4) the proceeds from any sale of the stock had to be applied first to the principal, interest, and early payment fees outstanding on the loan. Defendants argue that these restrictions demonstrate that the SIP shares indirectly secured the loans and the guarantee.

The restrictions placed on the SIP shares do suggest that the shares indirectly secured the loans and, if the court were writing on a totally clean slate, it might agree with defendants' argument. But the slate is not entirely clean because Comdisco sought and obtained approval of the Plan from the Board prior to implementation. In a letter dated January 16, 1998, Comdisco's outside counsel, Lola Miranda Hale, sought guidance from the Board as to whether under either Regulation G or Regulation U the loan would be deemed to be directly or indirectly secured by the securities purchase. Ms. Hale's letter detailed the proposed SIP, including that payment for the purchase of the shares was to be made entirely through a full recourse five year loan to be guaranteed by the company. The letter further detailed that: each borrower would be required to deliver a letter of direction to the lender bank irrevocably directing the company and its transfer agent to pay all future cash dividends on the shares to the lender for deposit in the borrower's

9

account with the lender; the lender was authorized to charge the borrower's account for early

payment of principal, interest and other charges that became due under the note; and the lender

was instructed to pay all proceeds of the loan directly to the company for the account of the

borrower in payment of the stock.

Ms. Hale's letter further explained that each borrower was to execute a letter of direction

providing that dividends be applied to the payment of interest on the loan, that under the Plan no

sale of the stock could be made within the first anniversary of the exercise date, and that no sale

at any time could be effected unless all principal, interest and early payment fees due on the loan

had previously been paid or all proceeds of the sales were simultaneously applied first to

payment of all such principal, interest and early payment fees. Finally, Ms. Hale's letter

informed the Board that the stock was to be held in Comdisco's legal department until all

restrictions under the Plan as to the purchased shares had lapsed, and that each participant was

required to deliver to the company's general counsel a stock power endorsed in blank. Ms. Hale

received a response from James B. McCauley, Senior Attorney for the Board, indicating that it

was the staff's opinion that the proposed transaction did not constitute a loan secured "directly or

indirectly" by the purchase stock as contemplated by Regulations G and U.

Defendants argue that the McCauley letter is meaningless because Hale failed to inform

the Board of every restriction the Plan placed the purchase shares. The court rejects this

argument. It is true that the letter did not set out a complete list of the restrictions. It did,

however, detail the key restriction that any outstanding amounts on the loan would be paid from

the proceeds of any sale of the stock at any time. Of all of the restrictions on the stock, it is this

restriction that would most suggest that the loans (or guarantee) were indirectly secured by the

stock because it is this restriction that would most likely ensure repayment of the loan. Because

the Board was informed of the key restriction, the court sees no reason to reject Hale's reliance

on that opinion in advising Comdisco as to the legality of the Plan. Because the Board and its

staff has primary responsibility for interpreting the Exchange Act and regulations promulgated

thereunder, the staff's opinion is entitled to substantial weight. See Revlon, Inc., v. Pantry Pride,

Inc., 621 F.Supp. 804, 815 (D.C. Del. 1985); Ford Motor Credit Co. v. Milhollin, 444 U.S. 555

(1980) (deference given to official staff memorandum of the Federal Reserve Board).

Accordingly, the court concludes that the SIP plan did not violate either Regulation G or

Regulation U.

Moreover, even if defendants could establish a technical violation of the regulations, the

mere existence of a violation is not sufficient to support either of their affirmative defenses. To

establish their Rule 10b-5 claim in their fifth affirmative defense, defendants must have evidence

of scienter; i.e. evidence that Comdisco had an intent to deceive, manipulate or defraud. Ernst &

Ernst v. Hochfelder, 425 U.S. 185, 193 (1976). But Comdisco (and the bank) obtained advice of

counsel before making any representations to defendants as to the Plan's compliance, and before

advising Comdisco, Hale had obtained the Board's staff opinion that the Plan did not violate

either of the regulations. There is no evidence that Hale was involved in Comdisco's alleged

scheme to defraud defendants, let alone evidence sufficient to raise a strong inference of scienter.

The far more compelling conclusion is that Comdisco intended and believed that the Plan

complied with the regulations. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., ___ U.S. ___,

127 S.Ct. 2499, 2509-10 (2007) (to allege scienter a complaint must allege facts such that a

reasonable person would deem the inference of scienter cogent and at least as compelling as any

opposing inference one could draw from the facts alleged).

Finally, even if there was a technical violation of one of the Regulations, a violation of a

regulation that is not designed to protect individual investors does not necessarily render the

contract "illegal" in the sense that it would be unenforceable.  See ADM Investor Services, Inc.

v. Collins, 515 F.3d 753 (7th Cir. 2008).  As this court has already held in Costello III, defendants

have no private right of action under § 7(d) or 29(b) of the Exchange Act, and thus no standing

to assert the illegality of the loans as an affirmative defense.  That same reasoning applies to

defendants' claim that the contract is illegal and thus unenforceable.  Defendants simply are not

in the "zone of interests" protected by those regulations.  Therefore, there is no merit to

defendants' illegality defense.[3]

### CONCLUSION

For the reasons set forth above, plaintiff's motions for summary judgment are granted.

Duncan and Paul's motion to amend their affirmative defenses (Docket No. 187) is denied.  All

other pending motions are denied as moot.  Plaintiff is directed to prepare final judgment orders

---

[3]Defendants have raised a number of other arguments, all of which have been rejected in earlier opinions and will not be addressed again.

as to each defendant and present them to the court on October 2, 2008, at 9:30 a.m.  Each

judgment order shall calculate interest to that date.

**ENTER:      September 24, 2008**

**Robert W. Gettleman**
**United States District Judge**